UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16 CR 7 RLW (ACL) |
| | ) | |
| PEDRO INFANTE-RIVERA, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. § 636(b). Pending before the undersigned are Defendant Infante-

Rivera's three pretrial motions. (Docs. 21, 22, and 29.)

The Defendant entered the United States in 1996 without inspection. He was

convicted in a Missouri Circuit Court of two separate drug felonies in 2004—possession

of more than 35 grams of marijuana and possession with intent to distribute more than

five grams of marijuana. While serving a sentence of incarceration for those drug

convictions, the Defendant's unlawful presence was discovered and expedited removal

proceedings were initiated when an Immigration Agent served the Defendant with a

"Notice of Intent to Issue a Final Administrative Removal Order." The Defendant

waived his right to rebut the charges and his right to seek judicial review. The Defendant

was deported when he completed the term of incarceration for the drug offenses. When

the Warrant of Removal/Deportation was executed, the Defendant left the country on

foot, headed for Mexico. The next day, the Defendant reentered the United States

without inspection.  Eleven years later, the Defendant's presence in the United States was discovered by an Immigration Agent.  The instant Indictment for Reentry of Removed Alien was filed two weeks later.

Each of the Defendant's Motions to Dismiss requests dismissal of the Indictment for a separate and distinct reason.  One claim is that the Defendant was not previously convicted of an aggravated felony so there is no way for the Government to prove the offense.  Another claim is that the statute of limitations has been violated because the Defendant was "found in" the United States more than five years before he was indicted. A third claim is that the Defendant's deportation in 2004 violated his due process rights as set out in 8 U.S.C. § 1326 based on a claim that he was afforded no administrative or judicial review, because his prior conviction for possessing more than five grams of marijuana was improperly identified as an aggravated felony.

In consideration of the pleadings identified above, the evidence adduced at the hearing, which included testimony from one law enforcement officer, as well as numerous exhibits submitted by both parties, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motions to Dismiss be denied.

## I.  Summary of Law Governing Removal of Criminal Aliens

The Constitution requires that "[n]o person shall be. . .deprived of life, liberty, or property without the due process of law[.]"  U.S. Const. amend. V.  The Supreme Court has recognized that the Due Process clause of the Fifth Amendment applies to "[e]ven

one whose presence in this country is unlawful, involuntary, or transitory." *Matthews v.*

*Diaz*, 426 U.S. 67, 77 (1976).

The recognition that individuals who are not lawfully present in the United States

should receive due process is also considered in the Immigration and Naturalization Act's

(INA) provisions regarding how criminal aliens should be removed after having been

convicted of various types of criminal offenses.  Title 8 U.S.C. § 1228, Expedited

removal of aliens convicted of committing aggravated felonies, provides in pertinent part:

> The Attorney General shall provide for the availability of special removal
> proceedings at certain Federal, State, and local correctional facilities for
> aliens convicted of any criminal offense. . .[including aggravated felons]. . .
> Such proceedings shall be conducted. . .in a manner which eliminates the
> need for additional detention at any processing center of the [Immigration
> and Naturalization Service (INS)] and in a manner which assures expedi-
> tious removal following the end of the alien's incarceration for the under-
> lying sentence. . .

8 U.S.C. § 1228(a)(1).  "An alien convicted of an aggravated felony shall be conclusively

presumed to be deportable from the United States."  8 U.S.C. § 1228(c).

Title 8 U.S.C. § 1101(a)(43) defines "aggravated felony" by listing all the

different types of criminal offenses to which the term applies.  The subsection that

defines the relevant "aggravated felony" for the instant case is § 1101(a)(43)(B)—"illicit

trafficking in a controlled substance (as defined in section 802 of Title 21), including a

drug trafficking crime (as defined in section 924(c) of Title 18).

Another relevant INA provision reveals that controlled substance convictions that

are not aggravated felonies and committed by aliens may result in deportation.

Any alien who at any time after admission has been convicted of a violation of. . .any law or regulation of a State, the United States, or a foreign country relating to a controlled substance. . ., other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

8 U.S.C. § 1227(a)(2)(B)(i).

The Code of Federal Regulations sets out how a "Deciding Service officer"[1] may initiate the expedited removal of an aggravated felon. First,

[a]n issuing [INS] officer shall cause to be served upon an alien a Form I-851, Notice of Intent to Issue a Final Administrative Deportation Order (Notice of Intent), if the officer is satisfied there is sufficient evidence, based upon questioning of the alien by an immigration officer and upon any other evidence obtained, to support a finding that the individual: (iii) Has been convicted. . .of an aggravated felony and such conviction has become final.

8 C.F.R. § 238.1(b)(1)(iii).

Expedited removal proceedings for an aggravated felony commence once the alien has received personal service of the "Notice of Intent" that sets forth:

the preliminary determinations and inform[s] the alien of [INS'] intent to issue a Form I-851A, Final Administrative Removal Order, without a hearing before an immigration judge. The Notice of Intent shall constitute the charging document. ***The Notice of Intent shall include allegations of fact and conclusions of law***. It shall advise that the alien: has the privilege of being represented at no expense to the government, by counsel of the alien's choosing, as long as counsel is authorized to practice in removal proceedings; may request withholding of removal to a particular country if he or she fears persecution or torture in that country; may inspect the evidence supporting the Notice of Intent; may rebut the charges…

8 C.F.R. § 238.1(b)(2)(i) (emphasis added). *See also* 8 U.S.C. § 1228(b)(4).[2]

---

[1] "[A] district director, chief patrol agent, or another immigration officer…", 8 C.F.R. § 238.1(a). There is no requirement for an immigration judge to conduct the proceeding.

If an alien disagrees with the contents of the Notice of Intent, the alien has "10 calendar days from service of the Notice of Intent or 13 calendar days if service is by mail to file a response to the Notice of Intent." 8 C.F.R. § 238.1(c)(1). If an alien chooses to rebut the charges against him, "the alien may. . .submit a written response rebutting the allegations supporting the charge. . ." *Id.*

In the event a Deciding Service officer finds that an "alien's timely rebuttal, raises a genuine issue of material fact regarding the preliminary findings," or "that the alien is not amenable to removal under [the Expedited removal statute]. . .the deciding Service officer shall terminate the expedited proceedings" and take the necessary steps for removal proceedings to be initiated before an immigration judge. 8 C.F.R. § 238.1(d)(2)(ii)(A) and (d)(2)(iii).

The "Expedited proceedings" section of 8 U.S.C. § 1228 notes:

---

2   Section 1228(b)(4) directs that: Proceedings before the Attorney General under this subsection shall be in accordance with such regulations as the Attorney General shall prescribe.

> The Attorney General shall provide that—
> (A)   the alien is given reasonable notice of the charges and of the opportunity described in subparagraph (C);
> (B)   the alien shall have the privilege of being represented (at no expense to the government) by such counsel, authorized to practice in such proceedings, as the alien shall choose;
> (C)   the alien has a reasonable opportunity to inspect the evidence and rebut the charges;
> (D)   a determination is made for the record that the individual upon whom the notice for the proceeding under this section is served (either in person or by mail) is, in fact, the alien named in such notice;
> (E)   a record is maintained for judicial review; and
> (F)   the final order of removal is not adjudicated by the same person who issues the charges.

> Notwithstanding any other provision of law, the Attorney General shall provide for the initiation and, to the extent possible, the completion of removal proceedings, ***and any administrative appeals thereof***,[3] in the case of any alien convicted of an aggravated felony before the alien's release from incarceration for the underlying aggravated felony.

8 U.S.C. § 1228(a)(3)(A) (emphasis added).

The aforementioned recitation of relevant provisions within the INA clearly directs Department of Homeland Security (DHS) officers to use expedited procedures to remove aliens who are not lawful permanent residents and have committed an "aggravated felony."  8 U.S.C. § 1228(b)(1)-(2).  While the procedures are swift there is allowance for judicial review.  The expedited removal statute provides:

> (3)    The Attorney General may not execute [a final order of removal] until 14 calendar days have passed from the date that such order was issued, unless waived by the alien*, **in order that the alien has an opportunity to apply for judicial review*** under section 1252 of this title.

8 U.S.C. § 1228(b)(3) (emphasis added).  Section 1252 indicates that review of a Final Order of Removal is possible if:

> (1)    the alien has exhausted all administrative remedies available to the alien as of right, and

> (2)    another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

---

[3]    The "any administrative appeals" language is interpreted as referring to the ability of the Deciding Service officer to initiate removal proceedings with an immigration judge in response to an alien's rebuttal that raises a genuine issue of material fact regarding the "preliminary findings" (which include both findings of fact and conclusions of law).

8 U.S.C. § 1252(d)(1)-(2).

The INA provides that entry of an alien into the United States without inspection (and other methods of improper entry) is a misdemeanor for the first commission of such offense.  8 U.S.C. § 1325.  If an alien is found to be present in the United States after a prior deportation (or other similar order), the charge of Reentry of Removed Alien may apply which is a felony.  8 U.S.C. § 1326.

### III.  Findings of Fact

Defendant Pedro Infante-Rivera was born in Mexico and first entered the United States on or about January 1, 1996 at or near Progresso, Texas.  Using the alias, Jose Chaires-Garcia, the Defendant was arrested by the Leachville Police in Arkansas on November 22, 1997, for a Controlled Substance offense involving less than 28 grams; the disposition for the case is unknown.  (Doc. 42-2 at 26-27; Def.'s Ex. Q at 6-7.)

Criminal history records reflect that the Defendant was arrested and convicted of a number of criminal offenses in Missouri.  The Missouri Court records that have been submitted by the parties reflect that the Defendant was identified as Pedro Infante, Pedro R. Infante, and Pedro Ribera Infante.  He was convicted of at least one misdemeanor and two felonies in Dunklin County, Missouri, prior to being deported.  First, he was convicted of Driving While Intoxicated (Combined Alcohol/Drug) in Case No. 35R030100064 on March 20, 2001 following his arrest for offense conduct that occurred on January 12, 2001.  (Doc. 42-2 at 9; Def.'s Ex. Q at 9.)  Next, he was convicted of felony **Possession of a Controlled Substance, that being more than 35 grams of marijuana** (Case No. 03CR76516101), on February 11, 2004 based on conduct that

occurred on *December 12, 20013*.  (Doc. 42-2 at 1-8.)  The parties agree that a third Missouri conviction (Case No. 04F6CR0022901) is documented related to **Possession of more than five grams of Marijuana with the Intent to Distribute**; the offense date was *February 18, 2004* and the conviction date was March 10, 2004.  *Id*. at 15-20.

The day the Defendant was convicted of the possession with intent case, March 10, 2004, his probation was revoked in the possession case.  He was received at the Eastern Reception and Diagnostic Correctional Center (ERDCC) on or about March 16, 2004 (Def.'s Ex. Q at 12) to begin a period of shock incarceration which was completed on July 10, 2004 (Doc. 42-2 at 1).

Three days after the Defendant was received at the ERDCC to begin service of the term of shock incarceration, he was encountered by an Immigration Agent.  On March 23, 2014, a "Record of Deportable/Inadmissible Alien," hereinafter "Record," was completed.  *Id*. at 26-27.  The Record identified the Defendant as Pedro Infante-Rivera although other aliases of Pedro Infante and Jose Chaires-Garcia were noted.  *Id*. at 26. The Record further reported that at some point the Defendant had received a work authorization that was due to expire on March 4, 2005 and that he did not have a passport, visa, or an I-130 petition.  *Id*. at 32.  It also noted that the Defendant's wife was a resident alien.  *Id*. at 27.

Presuming that one of the Defendant's prior drug convictions qualified as an aggravated felony, expedited removal proceedings were initiated against the Defendant.

Immigration Agent Tyson Imming[4] served a "Notice of Intent to Issue a Final Administrative Removal Order" (NOI) on the Defendant in person on April 13, 2004 while the Defendant was at the ERDCC. *Id*. at 22-23. The NOI was issued by Supervisory Special Agent Dan Strong on April 8, 2004. *Id*. at 22. The "Charge" section of the NOI informed the Defendant that he was deportable because he had been "convicted of an aggravated felony," *id*.; a continuation page (Form I-831) set out the details of the Defendant's two prior felony drug convictions from Dunklin County, *id*. at 25. The "Charge" section also stated that INS was serving the NOI "without a hearing before an Immigration Judge." *Id*. at 22. The NOI set out the Defendant's "Rights and Responsibilities" which included the right to counsel, the requirement of a response within ten days,[5] and a description of what an alien might include a response:

> you may: request, for good cause, an extension of time; ***rebut the charges stated above (with supporting evidence)***; request an opportunity to review the government's evidence; admit deportability; designate the country to which you choose to be removed in the event that a final order of removal is issued (which designation the Service will honor only to the extent permitted under section 241 of the Act, 8 U.S.C. 1231); and/or, if you fear persecution in any specific country or countries on account of race, religion, nationality, membership in a particular social group, or political opinion or, if you fear torture in any specific country or countries, you

---

[4] Agent Imming did not testify at the pretrial motion hearing. Both parties submitted copies of the immigration forms that were certified by Agent Imming. The Defendant did not dispute that the NOI, Final Administrative Removal Order, or Warrant of Removal/Deportation were served on him as reflected in each of the forms.

[5] The section entitled "Your Rights and Responsibilities" on the NOI stated "[y]ou must respond to the above charges in writing to the Service address provided on the other side of this form within 10 calendar days of service of this notices (or 13 calendar days if service is by mail). **The Service must <u>RECEIVE</u> your response within that time period.**" (Doc. 42-2 at 22.) The deadline for a response was also printed in bold on the bottom of the back page of the NOI. *Id*. at 23.

> may request withholding of removal under section 241(b)(3) of the Act
> or withholding/deferral of removal under the Convention Against Torture
> and Other Cruel, Inhuman or Degrading Treatment or Punishment (Con-
> vention Against Torture). A grant of withholding or deferral of removal
> would prohibit your return to a country of countries where you would be
> persecuted or tortured, but would not prevent your removal to a safe country.

*Id*. (Emphasis added.) It also explained that an alien has the right to "seek judicial review of any final administrative order by filing a petition for review within 14 calendar days after the date such final administrative order is issued, or you may waive such appeal by stating, in writing, your desire not to appeal." *Id*. Agent Imming certified that he explained the Notice to the Defendant in Spanish. *Id*. at 23.

The Defendant acknowledged receipt of the Notice. *Id*. He also checked boxes in a section entitled "I Do Not Wish to Contest or Request Withholding of Removal" that provided:

1) I admit the allegations and charge in this Notice of Intent. I admit that I am deportable and acknowledge that I am not eligible for any form of relief from removal. I waive my right to rebut and contest the above charges and my right to file a petition for review of the Final Removal Order. I do not wish to request withholding or deferral of removal. I wish to be removed to Mexico.

2) I also waive the 14 day period of execution of the Final Removal Order.

*Id*. The Defendant signed the back page of the NOI in two separate locations and dated his signatures April 13, 2004. *Id*. A fingerprint appears to the side of the Defendant's printed name.

In consideration of the NOI and evidence within the administrative record of the INS, on April 15, 2004, a Deciding Service Officer of the INS (Interim Deputy Field

Office Director Ken Carlson) found the Defendant was not a United States citizen and had not been lawfully admitted for permanent residence, that he had a final conviction for an aggravated felony as defined in the INA, that he was deportable, and ordered him removed from the United States. *Id*. at 24. Those findings were set out in a "Final Administrative Removal Order," Form I-851A, that was sent to the Defendant on April 23, 2004 by certified mail with return receipt. *Id*.

Three months after the "Final Administrative Removal Order" was sent to Defendant, a Warrant for the Removal and Deportation of the Defendant was signed by a Department of Homeland Security official on July 12, 2004 (Ken Carlson who also signed the Final Administrative Removal Order). *Id*. at 28. The INS Officer who executed the Warrant noted that the Defendant left the United States from El Paso, Texas headed for Mexico afoot on July 16, 2004. As previously noted, the Defendant completed a term of shock incarceration on July 10, 2004. His conviction record reflects that a four year term of supervised probation commenced on July 10, 2004 and was completed on July 10, 2008.

The day after the Defendant's deportation, he reentered the United States on foot at Nuevo Progresso by the river without inspection or permission. (Doc. 22 at 14-15, marked Def.'s Ex. B at 2-3.) A couple of years after the Defendant unlawfully reentered the United States he had several encounters with law enforcement authorities. One encounter occurred on **April 7, 2006** when the Defendant was cited for an "Animal at Large" ordinance violation by the Kennett Police Department. (Doc. 22 at 21, marked Def.'s Ex. G.) Another one occurred on **August 4, 2006** when he was stopped by the

Missouri State Highway Patrol (MSHP) for Driving Vehicle to Left Side of Roadway within 100 feet of Intersection or Railroad Grade Crossing; he was fined for the offense on August 28, 2006. (Doc. 22 at 17, marked Def.'s Ex. D.) On **November 24, 2007**, the Defendant was arrested by the MSHP on multiple charges--Driving While Intoxicated (Alcohol) (Def.'s Ex. Q at 13-14) and Operating Vehicle on Highway without a Valid License (Doc. 22 at 18, marked Def.'s Ex. E). A rap sheet reflects the Defendant was convicted of the DWI offense on January 18, 2008 in Case No. 07DUCR01660, however, no formal court record or docket sheet was submitted. (Def.'s Ex. Q at 13-14.) The rap sheet indicates a suspended imposition of sentence was ordered and the Defendant was placed on probation for two years. *Id.* A docket sheet from Missouri Case.net for the driving without a license offense case (Case No. 07DUCR01659) reflects that the Defendant pled guilty to not having the license on January 18, 2008 (Doc. 22 at 18, marked Def.'s Ex. E)—the same day as the DWI guilty plea reported in the rap sheet. The rap sheet further reports yet another suspended imposition of sentence and a term of probation following an arrest for Operating a Vehicle without a License (Case No. 041344165) resulting from what is reflected as an arrest by an officer of the Butler County Sheriff's Department on September 3, 2008. (Def.'s Ex. Q at 14.) The arrest and guilty plea dates, however, are not chronological and it is unclear whether this case is in fact one of the cases ending in 1659 and 1660 mentioned above, or if it is altogether different. (Def.'s Ex. Q at 14-15.) The guilty plea date (October 15, 2007) reflected for this last offense is prior to the reported arrest date (September 3, 2008). (Def.'s Ex. Q at 14-15.)

Over at least the past decade, Immigration and Customs Enforcement (ICE) has introduced training and tools that are available nationwide to assist law enforcement officials in identifying illegal immigrants. On August 27, 2007, Missouri Governor Matt Blunt directed that all Missouri law enforcement agencies verify the immigration status of any criminal presented for incarceration. (Def.'s Ex. P at 1.) Nearly one year later, in July of 2008, Governor Blunt announced that ten MSHP troopers completed a training program whereby they were specially deputized to assist ICE agents in enforcing federal immigration laws under ICE's supervision and authority through section 287(g)[6] of the INA. (Def.'s Ex. M.) In October 2008, another announcement indicated that three joint task forces would be set up in Kansas City, Springfield, and St. Louis to focus on illegal immigration. (Def's Ex. R at 1-2.) The task forces included MSHP troopers and immigration officials. The troopers were expected to spend one week every three months working in federal immigration offices.

By the Spring of 2010, Two Memoranda of Agreement regarding Secure Communities were entered into by ICE and MSHP officials—one on June 25, 2008 (Doc.

---

[6] The undersigned interprets the reference to 287(g) as being 8 C.F.R. § 287(g) which was codified at 8 U.S.C. § 1357(g) and is entitled "Performance of immigration functions by State officers and employees." The first subsection provides that the Attorney General may enter into written agreements with a State, or any political subdivision of a State under "which an officer or employee of the State. . ., who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States. . ., may carry out such function…" Subsection two adds that "[a]n agreement under this subsection shall require that an officer or employee of a State or political subdivision of a State performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function, and shall contain a written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws."

22 at 48, marked Def's. Ex. K at 11) and the other on April 2, 2010 (Def's Ex. S at 6.)

An ICE publication explains the intent of Secure Communities is to encourage federal and state partnerships that increase the sharing of information regarding individuals who are unlawfully present in the United States.

> When state and local law enforcement officers arrest and book someone into custody for a violation of a criminal offense, they generally fingerprint the person. After fingerprints are taken, the state and local authorities submit the fingerprints to the FBI. The FBI takes these fingerprints and runs them through its database of criminal records and sends the state and local authorities a record of the person's criminal history.

> Under Secure Communities, [the Department of Homeland Security] receives these fingerprints from the FBI, so that ICE can determine if that person is also subject to removal (deportation). This approach, whereby the fingerprints that are sent to the FBI are then shared with DHS, fulfills a 2002 Congressional mandate for federal law enforcement agencies to share information that is relevant to determine the admissibility or deportability of an alien. See 8 U.S.C. § 1722(a)(2).

> If the person has been previously encountered and fingerprinted by an immigration official and there is a digitized record, then the immigration database will register a "match." ICE then reviews other databases to determine whether the person is here illegally or is otherwise removable.

(Def's Ex. N at 4.) When clicking the website link at the bottom of the page of Defendant's Exhibit N, a "History" window appears that states "Secure Communities was an immigration enforcement program administered by. . .ICE from 2008 to 2014." *See* https://www.ice.gov/secure-communities.

No evidence was submitted to show whether the Defendant's fingerprints were taken as a result of his arrests that occurred between July 17, 2004 and September 3,

2008, following his reentry into the United States, or that any of the State or local law enforcement officers who encountered him had received any of the specialized training offered by ICE.[7]

Nearly eight years after the Defendant's last reported guilty plea in a Missouri State Court, an Immigration Agent was investigating a subject whose last name included part of the Defendant's last name, Infante. In late November of 2015, as part of the Agent's investigation, a search was conducted on the Missouri Case.net database and the Agent came across a number of the Defendant's conviction records. The Agent felt the Defendant's last name was uncommon and decided to dig further to determine whether the Defendant was related to the individual named Infante who was under investigation. The Agent discovered the two names were not related; he also discovered that the Defendant had previously been deported.

Next, the Agent reviewed the Defendant's Alien Registration file ("A-file) which contained information regarding the Defendant's deportation in 2004. Once an A-file is

_____

[7] Another program available to law enforcement agents for the detection of illegal aliens is a tool called the "Illegal Alien Query" or IAQ available through the National Law Enforcement Telecommunication System (NLETS) database. The MSHP Criminal Justice Information Services Newsletter for July-September 2007, admitted as Defendant's Exhibit O, included details about IAQs and how users could access the tool. The Newsletter also reported that of the 4,505 IAQ transactions that were made by Missouri agencies, 600 Law Enforcement Support Center (LESC) detainers were placed on subjects incarcerated in Missouri. (The LESC is operated by ICE; the purpose of LESC is to "provide timely information on aliens suspected of criminal activity and status information on aliens under arrest." *Id*. at 2.) The Newsletter added "[d]espite those numbers NLETS reports that nationally IAQ's make up less than 1/10[th] of 1% of queries across NLETS." That being said, "[o]perators [we]re encouraged to become familiar with this transaction and [to] make this critical information available to officers." *Id*.

created for an individual, any and all information forwarded to ICE from other agencies or created by ICE is stored in the A-file. In reviewing the Defendant's A-file, the Agent learned that ICE officials had received no information from any other law enforcement agency nor had any ICE official had contact with the Defendant from the time the Defendant left the United States on foot in July of 2004 until the Agent stumbled across the records of the Defendant's Missouri convictions by accident in late November 2015. Less than two months after the Agent's discovery of the Defendant's convictions on Case.net, on January 6, 2016, the Agent found the Defendant at his residence in Poplar Bluff, Missouri and arrested him. The instant Indictment was returned two weeks later.

## IV.  Conclusions of Law

Two of the three pending Motions to Dismiss in this case are related to interpretation of an Immigration and Nationality Act (INA) statute, 8 U.S.C. § 1326(a) and (b), which defines a crime identified as "Reentry of removed aliens."  As described by Justice Breyer in *Almendarez-Torres v. United States*, 523 U.S. 225, 226-27 (1998), 8 U.S.C. § 1326:

> . . .forbids an alien who once was deported to return to the United States
> without special permission, and it authorizes a prison term of up to, but
> no more than, two years.  Subsection (b)(2) of the same section authorizes
> a prison term of up to, but no more than, 20 years for "any alien described"
> in subsection (a), if the initial "deportation was subsequent to a conviction
> for commission of an aggravated felony."

Section 1326(a)(2) describes the conduct that qualifies as a violation of the "Reentry of removed aliens" statute, as follows:

> any alien who—has been. . .deported, or removed. . .and thereafter. . .is at

any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States. . .the Attorney General has expressly consented to such alien's reapplying for admission. . .

In the third Motion to Dismiss, the Defendant moves for dismissal pursuant to 8 U.S.C. § 1326(d) claiming that he was denied due process because he was wrongfully determined to be an aggravated felon which resulted in him not being afforded any administrative remedies or the right to contest his deportation before an immigration judge. Section 1326(d) provides that an alien may collaterally attack the validity of the deportation order relied upon for the alleged § 1326 reentry violation if the alien can demonstrate three things:

(1)      the alien exhausted any administrative remedies that may have been available to seek relief against the order;

(2)      the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3)      the entry of the order was fundamentally unfair.

The undersigned will address each of the Defendant's claims.

### IV.A.  The Motion to Dismiss based on claim Defendant was not convicted of an aggravated felony (Doc. 21)

The Defendant's Motion to Dismiss related to his position that he was not convicted of an aggravated felony is in essence an allegation that the Indictment is not supported by adequate evidence. He claims that in order for the Government to prove his guilt it "must prove beyond a reasonable doubt that [he] was convicted of an aggravated felony as defined by the. . .INA." (Doc. 21 at 1.) The Government responded that "the

existence of an aggravated felony is not an element of the offense and is not required to be set forth in the indictment,. . ."  (Doc. 26 at 5.)

"As a general rule, an indictment is sufficient if it 'first, contains the essential elements of the charged offense and fairly informs a defendant of the charges against which he must defend, and second, enables him to plead double jeopardy as a bar to a future prosecution." *United States v. Just*, 74 F.3d 902, 903 (8th Cir. 1996) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  *See United States v. Pemberton*, 121 F.3d 1157, 1169 (8th Cir. 1997) (holding to same effect).  The Indictment in the instant case is a plain, concise, and definite statement of the essential facts constituting the offense charged and complies in all respects with Rule 7(c) of the Federal Rules of Criminal Procedure.  Moreover, the Indictment closely tracks the language of the underlying statutes and, therefore, is legally sufficient.  *See United States v. Oakie*, 12 F.3d 1436, 1440 (8th Cir. 1993).

Additionally, "a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence."  *United States v. DeLaurentis*, 230 F.3d 659, 660 (3rd Cir. 2000) (alteration added) (holding that Fed. R. Crim. P. 12(b)(2) authorizes dismissal of an indictment on the grounds that its allegations are not sufficient to charge an offense but not on the grounds that the evidence is not sufficient to prove the charges).

> "In civil cases, of course, the summary judgment procedures contemplated by Federal Rule of Civil Procedure 56 may be utilized to test, pretrial, the sufficiency of the evidence to establish triable issues of fact; but there is no corollary in criminal cases.  The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal

Rule of Criminal Procedure 29 . . . [W]e simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be."

*United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (quoting *DeLaurentis*, 230 F.3d at 661) (alterations in original).

Furthermore, it is well established that whether the prior removal of an alien who has reentered the United States was subsequent to a conviction for an aggravated felony "is a penalty provision, which simply authorizes a court to increase the sentence for a recidivist. It does not define a separate crime." *Almendarez-Torres v. United States*, 523 U.S. 225, 226-27 (1998).[8] *See also United States v. Haggerty*, 85 F.3d 403 (8th Cir. 1996).

In this case, while the Government alleged that the Defendant's "last removal was subsequent to his conviction for the aggravated felony of Possession of a Controlled Substance with Intent to Deliver" (Doc. 2 at 1), that information need not be proven in order for the Defendant to be found guilty of Unlawful Reentry by a Removed Alien. The question of whether the Defendant's prior conviction for Possession with Intent to Distribute more than five grams of Marijuana" (Doc. 42-2 at 15-20) is an aggravated felony, for purposes of this Motion (Doc. 21), will become ripe in the event the

---

[8] After the filing of this Motion, Defense Counsel learned of the Supreme Court's decision in *Almendarez-Torres*. Although Counsel recognizes the Eighth Circuit is "bound by the decision until the Supreme Court expressly overturns it," Counsel "contends that the Supreme Court now believes that its decision in *Almendarez-Torres* was an error and that it holds no *stare decisis* value" and wishes to preserve the issue for appeal. (Doc. 29 at 11, citing *United States v. Alvarez*, 320 F.3d 765, 767 (8th Cir. 2002).)

Defendant is found guilty of the charged offense.  The answer to that question will determine the applicable penalty range.

### IV.B.  The Motion to Dismiss for violation of the statute of limitations based on claim the Defendant was "found in" the United States more than five years prior to the return of the instant Indictment (Doc. 22)

The Defendant alleges that ICE officials could have discovered his unlawful presence in the United States through the exercise of diligence typical of law enforcement authorities following his arrests by State and local authorities between 2006 and 2008. The Defendant believes ICE officials should have found him long before November 2015, for various reasons such as:  1) his multiple prior contacts with State and local law enforcement agencies and information related to those contacts was entered in the National Crime Information Center (NCIC); 2) his contacts with law enforcement were also recorded in the Missouri Case.net database which is accessible to ICE agents; 3) the MSHP 287(g) agreement with ICE[9] enabled troopers to receive special training to assist ICE in identifying, apprehending, and detaining illegal aliens along with the Secure Communities program and his unlawful presence in the United States should have been detected following his multiple arrests by the MSHP, 4) ICE authorities *should have* received a copy of the Defendant's fingerprints following his 2007 DWI arrest, matched those fingerprints with the record of his prior deportation, and discovered his presence,

---

[9]   The undersigned notes the earliest "287(g) agreement" between the MSHP and ICE was after the *Defendant's last arrest by a MSHP trooper which was on November 24, 2007* and there was no evidence that the MSHP trooper who made the arrest had received the training required under the agreement.  *See* Doc. 22 at 48, marked *Def.'s Ex. K at 11, Memorandum of Agreement dated June 25, 2008.*

and 5) improved technology should have enabled ICE to detect his unlawful presence much earlier than November 2015.

The Government argued there was no violation of the statute of limitations under *United States v. Gomez*, 38 F.3d 1031 (8th Cir. 1994), because the Defendant was not "found in" the United States as a result of his contacts with State or local law enforcement officers.  (Doc. 46.)

The undersigned will now examine whether the statute of limitations was exceeded in this case.

The Indictment in this case charges that the Defendant was "found in the United States, after having been removed and deported from the United States…"  (Doc. 2 at 1.) The *Gomez* case required the Eighth Circuit:

> to decide exactly what must be known to the government before a defendant alien is "found in" the United States. . .The prevailing view is that an alien is "found in" the United States when that alien is "discovered in" the United States."

*Gomez*, 38 F.3d at 1036 (citations omitted).  "Discovery" of the alien requires two elements, including:  1) the physical presence of the deported alien in the United States must be discovered, and 2) the identity and status of the previously deported alien must be ascertained.  *Id*.  The statute of limitations for a "found in" violation of the Reentry of Removed Alien statute "begin[s] running when **immigration authorities** could have, through the exercise of due diligence typical of law enforcement authorities, discovered the violation."  *Id*. at 1037 (Emphasis added.).  The *Gomez* Court noted, "[a]s the cases attest, the result of this diligence is that the time at which the **immigration authorities**

should discover the violation is often at or near the time the defendant is taken into custody." *Id.* (Emphasis added.) *See also United States v. Santana-Castellano*, 74 F.3d 593, 598 (5th Cir. 1996) ("[i]n instances where the deported alien surreptitiously enters the country, and is later discovered by the INS, the statute of limitations does not begin to run until his presence *is discovered by the INS*." (citations omitted) (emphasis added)).

"Courts have uniformly declined to find that state officials' knowledge of an alien's illegal presence in the United States may be imputed to federal immigration authorities to trigger the limitations period." *United States v. Uribe-Rios*, 558 F.3d 347, 353 (4th Cir. 2009) citing *United States v. Clarke*, 312 F.3d 1343, 1347 (11th Cir. 2002) (collecting cases and holding that "[t]o the extent that [the alien] contends that the knowledge of Florida police can be imputed to the INS and therefore is sufficient to start the running of the five year statute of limitations, we reject this argument"). Similarly, in a Second Circuit case, the court refused "to adopt a rule that would make the INS responsible for any immigration-related information discovered in state investigations of the hundreds of thousands of prisoners in state custody at any given time." *United States v. Mercedes*, 287 F.3d 47, 55 (2nd Cir. 2002).

The Defendant has provided no evidence showing that **prior to January 6, 2016, federal immigration authorities** were aware of his actual identity, presence in the United States, *and* his illegal immigration status. The Defendant submitted information related to partnership agreements between ICE and the MSHP that were instituted in June 2008 (Doc. 22 at 38-53, marked as Def.'s Ex. K) and March 2010 (Def.'s Ex. S), that would enable state officers to help ICE officials identify aliens who are unlawfully

present in the United States.  The Defendant, however, did not submit evidence that any officer who arrested him between July 17, 2004 and September 3, 2008: 1) took the Defendant's fingerprints and submitted them in a manner that the results of fingerprint comparisons by the FBI would be forwarded to ICE, 2) had communication with ICE questioning the Defendant's immigration status, or 3) that any of the officers had received any specialized ICE training that would enable them to identify the Defendant as a previously deported person.

As set out above, *Gomez* is instructive as to the factors to be considered to determine whether the Defendant was "found in" the United States more than five years prior to the date the Indictment was returned (January 21, 2016), which would result in a violation of the statute of limitations.  *Gomez* is also factually distinguishable from the instant case.  Gomez, an illegal alien who had previously been deported to the country of Columbia in 1985, applied for resident alien status at an INS Legalization Office under an alias name which required him to submit his fingerprints *directly to immigration authorities* on May 3, 1988.  As the *Gomez* court noted, "[b]ecause the INS had in its possession Gomez's fingerprints [under both his alias and his real name], and had access to the FBI facilities for fingerprint comparison, it possessed both the information and the means necessary to determine Gomez's status as a deported alien."  *Gomez*, 38 F.3d at 1037.  While the Defendant here did not provide an alias to MSHP authorities, it is significant that Gomez appeared in person in front of *immigration officials* who took his fingerprints and needed to check his fingerprints to determine if he was eligible for temporary resident alien status.  After presenting himself to immigration officials, Gomez

was in fact granted temporary resident alien status and was later granted permanent

resident alien status. The *Gomez* court concluded there was not a violation of the statute

of limitations even though it assumed but did not find that the INS officials were

negligent, reasoning that although INS officials had Gomez's fingerprints available to

them under both his true and alias names, at that time it took an average of forty-five

calendar days for the FBI to process fingerprint comparisons. Significantly, the instant

Defendant did not present himself to immigration officials rather he surreptitiously

entered the United States after having been deported thereby preventing immigration

officials from being able to detect his reentry. *See United States v. Clarke*, 312 F.3d

1343, 1348, n. 4 (11th Cir. 2002) (distinguishing *Gomez* and *DiSantillo* based on fact

"that immigration authorities had information that, through the exercise of due diligence

typical of law enforcement authorities, could have led to the discovery of the defendant's

illegal presence"—Gomez was an alien who provided fingerprints directly to INS

officials on a falsified INS form and DiSantillo entered the United States through a

recognized immigration port of entry in New York after being issued a visa).

> The *Gomez* court further commented:

> The INS was sufficiently satisfied that if there was no negative response
> from the FBI after sixty days, applications for temporary resident alien status
> were routinely approved. . .there was nothing about Gomez's application that
> indicated a need for special or expedited treatment. Based on these findings,
> the earliest possible time at which the INS may have received reasonable notice
> that Gomez's file should be further pursued would have been if no report were
> received after the sixty-day non-response. . .

*Gomez*, 38 F.3d at 1037-38. The *Gomez* court held that the *earliest possible* time that Gomez was "constructively 'found in' the United States" was sixty days after he appeared at the INS Legalization Office in New York City and filed an INS Form I-687 under an alias along with other false statements and his fingerprints. Sixty days after his application would have been July 2, 1988. Based on that calculation, the Indictment of Gomez five years and four days after his visit to the INS Legalization Office was within the statute of limitations period.

The evidence received in this case shows that the Defendant's contacts with law enforcement officials following his reentry resulted in State and local officials receiving or possessing information about the Defendant's presence in the United States. That knowledge cannot be imputed to immigration officials. There is no evidence before the undersigned that the law enforcement officials who encountered the Defendant had knowledge of or utilized any of the available systems for notifying ICE officials of subjects believed to be in the country illegally. In fact, the record supports that no information regarding the Defendant's presence in the United States was forwarded to ICE after the Defendant was deported. Uniquely, the discovery of the Defendant's presence in the United States by immigration officials was by chance when an ICE Agent was investigating a different person suspected of immigration violations. Within less than two months after that discovery, immigration officials found the Defendant at his home and arrested him. The instant Indictment was filed fifteen days after the Defendant was "found in the United States" by immigration officials.

The Defendant's Motion to Dismiss based on a claim that the statute of limitations was violated should be denied.

### IV.C. Motion to Dismiss based on collateral attack of the Defendant's prior deportation order under § 1326(d) (Doc. 29)

The Defendant's third Motion to Dismiss earnestly seeks dismissal of the Indictment under 8 U.S.C. § 1326(d), which allows a defendant to collaterally attack the validity of the deportation order underlying a Reentry of Removed Alien charge. The Defendant alleges that his conviction for Possession with the Intent to Distribute more than five grams of Marijuana was not an aggravated felony and that as a result of that classification he faced expedited removal procedures which did not allow him to seek administrative review and deprived him of judicial review. He relies heavily on the United States Supreme Court's decision in *Moncrieffe v. Holder*, 133 S.Ct. 1678 (2013), which held that a conviction for possession with intent to distribute marijuana under Georgia law was not an aggravated felony.

The Government zealously argues that the Defendant's collateral attack on his prior deportation order must fail because the Defendant failed to exhaust the administrative and appellate remedies available to him prior to his deportation, and that the Defendant was in fact convicted of an aggravated felony even in light of the *Moncrieffe* decision.

*Moncrieffe* held that the definition of aggravated felony under the INA does not include "a state criminal statute that extends to the social sharing of a small amount of marijuana." *Moncrieffe*, 133 S.Ct. at 1682. Following a traffic stop, police found

Moncrieffe in possession of 1.3 grams of marijuana in his car, which the Court noted was the equivalent of about two or three marijuana cigarettes.  *Id*. at 1683.  He was charged with possessing marijuana with the intent to distribute.  The Court noted that it was considering Moncrieffe's case:

> to resolve a conflict among the Courts of Appeals with respect to whether a conviction under a statute that criminalizes both § 841's felony provision and its misdemeanor provision, such as a statute that punishes all marijuana distribution without regard to the amount or remuneration, is a conviction for an offense that "proscribes conduct punishable as a felony under" the CSA.

*Id*. at 1684.

The Government makes an argument that was not considered by the Supreme Court in *Moncrieffe*:

> employing the categorical approach, it is impossible to conclude that as charged, Infante-Rivera's offense involves the distribution of a small amount of marijuana for no remuneration. . .[Adding,] the *Shepard* approved documents admissible under the categorical approach, [include] no reference to the actual distribution of a controlled substance, an essential element of a § 841(b)(4) offense.

(Doc. 44 at 17.)  The undersigned agrees that the actual facts of the Defendant's case support that contention, however, *Moncrieffe* emphasized that "'[w]hether the noncitizen's actual conduct, involved such facts 'is quite irrelevant.'"  *Moncrieffe*, 133 S.Ct. at 1684.  The Court added that "the INA asks what offense the noncitizen was 'convicted' of,. . .not what acts he committed."  *Id*. at 1685.  Justice Sotomayor clarified:

> Because we examine what the state conviction necessarily involved, not the facts underlying the case, *we must presume that the conviction "rested upon [nothing] more than the least of th[e] acts" criminalized*, and then determine whether even those acts are encompassed by the generic federal

offense.

*Id*. at 1684 (emphasis added).  The Court stated:

> the fact of a conviction for possession with intent to distribute marijuana,
> standing alone, does not reveal whether either remuneration or more than
> a small amount of marijuana was involved.  It is possible neither was; we
> know that Georgia prosecutes this offense when a defendant possesses
> only a small amount of marijuana,[10]. . .and that "distribution" does not
> require remuneration…

*Id*. at 1686 (ciations omitted.)  As a result, the Court concluded that Moncrieffe's

conviction could correspond to either the CSA felony or the CSA misdemeanor.  The

same is true in this case.

Next, the Government contends that this case differs from *Moncrieffe* in that

simply considering more than five grams of marijuana to be a small amount and that

remuneration was not involved does not yield a conclusion that the conviction did not

"necessarily" involve a felony under the CSA, because the Defendant had a prior

conviction under State law that would increase the applicable penalty provision from a

misdemeanor to a felony.  (Doc. 44 at 18.)  This is a reasonable and logical argument,

however, the Defendant replied that the Supreme Court in *Carachuri-Rosendo v.*

*Holder*, 560 U.S. 563, (2010) disposed of this argument.  (Doc. 48 at 10.)

The facts of *Carachuri-Rosendo v. Holder*, were briefly described as follows:

---

[10]   The Defendant's possession with intent to distribute conviction differs slightly from
Moncrieffe's in that the Defendant was charged with a quantity of more than five grams.
While *Moncrieffe* did not define the term "small amount," the Missouri statute at issue in
this case could be charged based on 5.01 grams of marijuana which would likely be
deemed a "small amount" in consideration of the Supreme Court's limited discussion of
quantity.  *See Moncrieffe*, 133 S.Ct. at 1686, n. 7.

In the case before us, the Government argues that Carachuri–Rosendo, despite having received only a 10–day sentence for his Texas misdemeanor simple possession offense, nevertheless has been "convicted" of an "aggravated felony" within the meaning of the INA. This is so, the Government contends, because had Carachuri–Rosendo been prosecuted in federal court instead of state court, he *could have been* prosecuted as a felon and received a 2–year sentence based on the fact of his prior simple possession offense. Our holding in *Lopez* teaches that, for a state conviction to qualify as an "aggravated felony" under the INA, it is necessary for the underlying conduct to be punishable as a federal felony. We now must determine whether the mere possibility, no matter how remote, that a 2–year sentence might have been imposed in a federal trial is a sufficient basis for concluding that a state misdemeanant who was not charged as a recidivist has been "convicted" of an "aggravated felony" within the meaning of § 1229b(a)(3).

*Carachuri-Rosendo v. Holder*, 560 U.S. at 570. The Court held:

> when a defendant has been convicted of a simple possession offense that has not been enhanced based on the fact of a prior conviction, he has not been "convicted" under § 1229b(a)(3) of a "felony punishable" as such "under the Controlled Substances Act," 18 U.S.C. § 924(c)(2). The prosecutor in Carachuri–Rosendo's case declined to charge him as a recidivist. He has, therefore, not been convicted of a felony punishable under the Controlled Substances Act.

*Carachuri-Rosendo v. Holder*, 560 U.S. at 573. In examining the *Shepard* materials[11] permitted under the categorical approach that were submitted by the parties, it is not possible to decipher that the Defendant's possession with intent to distribute more than five grams of marijuana conviction included any information related to his status as a recidivist. As a result, in consideration of *Carachuri-Rosendo v. Holder* and *Moncrieffe*, the undersigned cannot conclude that the Defendant's possession with intent

---

[11]   These include "the terms of the charging document," "the defendant's own admissions or accepted findings of fact confirming the factual basis for a valid plea," or "some comparable judicial record of this information." *Shepard v. United States*, 544 U.S. 13, 25 (2005). Impermissible, then, are police reports or complaint applications. *Id.* at 16.

to distribute conviction is an aggravated felony based on his prior conviction for possessing more than 35 grams of marijuana.

As to the alleged fundamental unfairness of the prior deportation proceeding, the Defendant relies on *United States v. Camacho-Lopez*, 450 F.3d 928 (9th Cir. 2006), wherein the Ninth Circuit held that an alien "was removed when he should not have been and clearly suffered prejudice" based on a charge that the alien was removable only for having committed an aggravated felony and it was determined that his "prior conviction did not fit that definition." 450 F.3d at 930.

Even though the Defendant's prior conviction for possession with intent to distribute is not considered an aggravated felony under *Moncrieffe v. Holder*, 133 S.Ct. 1678 (2013), the Defendant cannot demonstrate that he suffered prejudice, because he cannot show that he would not have been deported.

The Supreme Court has held that "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *United States v. Mendoza-Lopez*, 481 U.S. 828, 837-38 (1987) (citation omitted). The Supreme Court continued, "[t]his principle means at the very least that where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense." *Id*. at 838. "Noting that § 1326 does not require proof that a deportation order was lawfully entered, the Court nonetheless held that the government

may not rely on the order to support a § 1326 conviction if 'fundamental procedural defects of the deportation hearing' deprived the aliens of 'their rights to appeal.'" *United States v. Mendez-Morales*, 384 F.3d 927, 929 (8th Cir. 2004), citing *Mendoza-Lopez*, 481 U.S. at 841-42. The Court declined "to enumerate which procedural errors are so fundamental that they may functionally deprive the alien of judicial review" *Mendoza-Lopez*, 481 U.S. at 839, n. 17, however, found a complete deprivation of judicial review where an Immigration Judge accepted waivers of the right to appeal that were not the result of considered judgments by aliens who were not represented by counsel because they were not considered or intelligent and did not properly advise the aliens of their eligibility to apply for suspension of deportation. *Id.* at 840.[12] The *Mendoza-Lopez* decision was codified by Congress in 1996 in the language of 8 U.S.C. § 1326(d). *United States v. Rodriguez*, 420 F.3d 831 (8th Cir. 2005).

In moving to dismiss an unlawful reentry indictment, a Defendant may collaterally attack the validity of the underlying deportation order on the basis that his prior deportation order was obtained in violation of his rights. To prevail in this type of collateral attack, a defendant must demonstrate three things:

(1)     the alien exhausted any administrative remedies that may have been available to seek relief against the order;

(2)     the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3)     the entry of the order was fundamentally unfair.

---

[12]   This holding was an affirmance of the findings of the Eighth Circuit and the District Court below. *Mendoza-Lopez*, 781 F.2d 111, 113 (8th Cir. 1985).

8 U.S.C. § 1326(d). *See Rodriguez*, 420 F.3d at 833. A defendant must satisfy "all three requirements in order to successfully collaterally attack the prior removal order." *United States v. Tamayo-Baez*, 820 F.3d 308, 313 (8th Cir. 2016), citing 8 U.S.C. § 1326(d), *United States v. Fernandez-Antonia*, 278 F.3d 150, 157 (2d Cir. 2002). "The Defendant 'bears the burden of proof in a collateral attack upon a prior deportation.'" *Id.* Citing *United States v. Martinez-Amaya*, 67 F.3d 678, 681-82 (8th Cir. 1995).

The undersigned finds that the Defendant fails to meet the § 1326(d) requirements which are examined below.

## IV.C.1.        Did the Defendant exhaust administrative remedies?

The Defendant argues that he "can clearly show that he exhausted all administrative remedies. . .because no such remedies. . .exist[ ]," relying on 8 U.S.C. § 1225.[13]   (Doc. 29 at 2.)

The Eighth Circuit has concluded that "if an alien knowingly and voluntarily waives his right to appeal an order of deportation, then his failure to exhaust administrative remedies will bar collateral attack on the order in a subsequent illegal reentry prosecution under § 1326(d)." *Tamayo-Baez*, 820 F.3d at 313, citing *United States v. Chavez-Alonso,* 431 F.3d 726, 728 (10th Cir. 2005) ("An alien who knowingly

---

[13]   The Defendant's arguments regarding the absence of administrative review and deprivation of judicial review relies in part on 8 U.S.C. § 1225, which was found unconstitutional by *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1087 (9th Cir. 2011), and is not the same as the statute that applies in this case--8 U.S.C. § 1228, Expedited removal of aliens convicted of committing aggravated felonies.

waives the right to appeal an immigration judge's order of deportation fails to exhaust administrative remedies under § 1326(d)(1).")[14]

Other circuits have also concluded that a defendant's decision to waive his right to contest his removal equates to a failure to exhaust administrative remedies. *United States v. Santiago-Ochoa,* 447 F.3d 1015, 1019 (7th Cir. 2006), citing *United States v. Martinez–Rocha,* 337 F.3d 566, 569 (6th Cir. 2003). The Seventh Circuit, in a case with underlying facts that are virtually identical to the instant case, explained:

> Because [Santiago-Ochoa] was removed under expedited procedures, he did not appear before an immigration judge, and thus did not have recourse to an administrative appeal before the Board of Immigration Appeals. But as he was informed by a notice whose receipt he acknowledged, there are special procedures for challenging expedited removal charges. *See* 8 U.S.C. § 1228(b)(4)(C) (requiring that alien have "reasonable opportunity to inspect the evidence and rebut the charges"); 8 C.F.R. § 238.1(c)(1) (providing that alien may respond to Notice of Intent within 10 calendar days of service, or 13 calendar days, if service is by mail. The alien may submit evidence of his own, request to review the government's evidence, or, if necessary, request an extension of the time for response.). The fact that Santiago–Ochoa chose not to avail himself of this remedy does not relieve him of his § 1326(d)(1) duty to exhaust.

*United States v. Santiago-Ochoa*, 447 F.3d 1015, 1019 (7th Cir. 2006).

As to the NOI served on the Defendant, the section entitled "Your Rights and Responsibilities" advised the Defendant that he could "rebut the charges" that he was

---

[14] On this point the Defendant relied in part on a Fourth Circuit case, *Etienne v. Lynch*, 813 F.3d 135, 140-41 (4th Cir. 2015) and the Government relied in part on *Malu v. Atty.Gen.*, 764 F.3d 1282, 1288 (11th Cir. 2014) ("[A]n alien must exhaust all administrative remedies by rebutting the charges—including the conclusion of law that she is an aggravated felony—before the Department."). The Eighth Circuit's decision in *Tamayo-Baez* is in line with the conclusion of the Eleventh Circuit and the undersigned's reasoning herein.

deportable and had been convicted of an aggravated felony. (Doc. 42-2 at 22.) In addition, the NOI included an option for the Defendant to mark a box indicating that he contested his deportability based on a claim he "was not convicted for the criminal offense[s alleged in] number 6" (the Defendant's prior drug convictions) or that he was "attaching documents in support of [his] rebuttal and request for further review." *Id*. at 23.

Instead, after being served with the NOI by Immigration Agent Imming, the Defendant chose to waive his rights to any type of review. The Defendant indicated his waiver by marking the two response boxes in the section entitled "I Do Not Wish to Contest or Request Withholding of Removal":

> 1)  I admit the allegations and charge in this Notice of Intent. I admit that I am deportable and acknowledge that I am not eligible for any form of relief from removal. I waive my right to rebut and contest the above charges and my right to file a petition for review of the Final Removal Order. I do not wish to request withholding or deferral of removal. I wish to be removed to Mexico.

> 2)  I also waive the 14 day period of execution of the Final Removal Order.

*Id*. The Defendant presented no evidence that he attempted to, or even intended to seek judicial review of the Removal Order, nor did he allege that he did not understand the NOI, or that his waiver of his right to judicial review was not knowing and voluntary.

The undersigned concludes that based on the applicable precedent in this Circuit, the Defendant has not met his burden of showing that he exhausted all of his administrative remedies or that he was prevented from doing so. As a result, the Defendant failed to meet the first § 1326(d) factor.

### IV.C.2. Did the deportation proceeding at which the Removal Order was issued improperly deprive the alien of the opportunity for judicial review?

The next consideration is whether the Defendant was deprived of the opportunity for judicial review as a result of the way the Removal Order was issued.

As noted in the preceding section, § 1228(b)(3) establishes that an alien may seek judicial review of an order of removal issued after expedited proceedings under 8 U.S.C. § 1252. *See* 8 U.S.C. § 1228(b)(3); *Gonzalez v. Chertof*, 454 F.3d 813, 815 (8th Cir. 2006). The INA includes a section entitled "Judicial review of orders of removal." 8 U.S.C. § 1252. The relevant subsections are cited below:

> **(C) Orders against criminal aliens**
>
> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), **no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in [§§] 1182(a)(2) or 1227(a)(2)(A)(iii), (B)[15 ],** (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title.
>
> **(D) Judicial review of certain legal claims**
>
> Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

---

[15] As previously noted, § 1227(a)(2)(B)(i) states that "any alien who at any time after admission has been convicted of a violation of. . .any law or regulation of a State,. . . relating to a controlled substance. . ., other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable."

8 U.S.C. §§ 1252(a)(2)(C), (D).

Exhaustion is also discussed in § 1252, as follows:

**(d) Review of final orders**
A court may review a final order of removal only if—

(1)     the alien has exhausted all administrative remedies available to the alien as of right, and

(2)     another court has not decided the validity of the order, *unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding* or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

8 U.S.C. § 1252(d)(1)-(2) (emphasis added).

In considering these provisions, the Eighth Circuit stated that "Congress has precluded judicial review of 'any final order of removal against an alien who is removable by reason of having committed' an aggravated felony, but we do have jurisdiction to review final orders of removal for 'constitutional claims or questions of law.'" *Escoto-Castillo v. Napolitano*, 658 F.3d 864, 865 (8th Cir. 2011), citing 8 U.S.C. § 1252(a)(2)(C). "When the issue is properly presented, this limited review includes whether the alien was in fact convicted of an aggravated felony." *Id.*, citing *Lewkowski v. INS*, 279 F.3d 644, 646 (8th Cir. 2002). Escoto-Castillo claimed that his Minnesota burglary conviction was not an aggravated felony because he had only been sentenced to 364 days and the execution of the sentence was stayed for 364 days. The Eighth Circuit concluded that although § 1252(a)(2)(D) gave it jurisdiction to consider the aggravated felony issue, the review was precluded based of Escoto-Castillo's 1) failure to exhaust

administrative remedies and 2) fact the 364-day sentence was based on "a post-removal state court order, evidence that was not a part of the administrative record on appeal." *Escoto-Castillo*, 658 F.3d at 866.

The INA, itself, authorizes judicial review of final orders of removal "only if—(1) the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). The Eighth Circuit has "repeatedly held that failure to exhaust administrative immigration remedies precludes a merits review of the unexhausted issue." *Escoto-Castillo*, 658 F.3d at 866 (citations omitted) (collecting cases).

Consistent with 8 U.S.C. § 1252(a)(2)(D), the NOI informed the Defendant of his right to seek judicial review of any final administrative order by filing a petition for review within 14 calendar days after the date such final administrative order was issued. (Doc. 42-2 at 22.) Having been advised of that right, the Defendant marked the box that stated he did not wish to contest the charges against him (*i.e.*, that he was deportable and had been convicted of an aggravated felony, *see* Doc. 42-2 at 22, "Charge" section). The box articulated "I waive my right to rebut and contest the charges and my right to file a petition for review of the Final Removal Order." *Id.* at 23.

The Defendant argues that his possession with intent to distribute conviction did not constitute an aggravated felony that would have made him eligible for expedited deportation proceedings which is a question of law. Such questions are not precluded from judicial review by the Eighth Circuit even where a defendant fails to exhaust administrative remedies. *Gonzales v. Chertoff*, 454 F.3d 813, 816 (8th Cir. 2006). Although the Defendant did not seek review of the determination that he was an

aggravated felon at the time of the expedited proceedings, he was certainly free to argue to the Eighth Circuit that neither of his felony drug convictions were aggravated felonies under 8 U.S.C. § 1101(a)(43)(F). That being said, the record supports the Defendant was not deprived of the opportunity for judicial review rather he failed to pursue the available remedy.

The undersigned finds that the Defendant fails to meet the second factor under 8 U.S.C. § 1326(d), because he was not deprived of his opportunity for judicial review.

### IV.C.3.        Was the entry of the removal order fundamentally unfair?

The final consideration is whether the entry of the Final Administrative Removal Order against the Defendant was fundamentally unfair. "To prove [an] expedited removal proceeding was 'fundamentally unfair in violation of due process,' [an alien] must show both 'a fundamental procedural error' and actual prejudice." *United States v. Santos-Pulido*, 815 F.3d 443, 445 (8th Cir. 2016), citing *Torres-Sanchez*, 68 F.3d 227, 230 (8th Cir. 1995). "A showing of prejudice in this context means 'there was a reasonable likelihood that but for the errors complained of the defendant would not have been deported.'" *United States v. Perez-Ponce*, 62 F.3d 1120, 1122 (8th Cir. 1995), citing *United States v. Encarnacion-Galvez*, 964 F.2d 402, 407 (5th Cir. 1992). *See also United States v. Mendez-Morales*, 384 F.3d 927, 931-32 (8th Cir. 2004).

In the Eighth Circuit:

[t]he law is clear that in order to succeed on a collateral challenge of a deportation order, a defendant must demonstrate, not only that the deportation hearing was so defective as to effectively foreclose his right to a direct judicial review of the deportation, but also that

he suffered actual prejudice from those defects.

*Perez-Ponce*, 62 F.3d at 1122 (citations omitted). "If the defendant was legally deportable and, despite the INS's errors, the proceeding 'could not have yielded a different result,' the deportation is valid for purposes of section 1326." *Id.*, citing *United States v. Galicia-Gonzalez,* 997 F.2d 602, 603 (9th Cir. 1993).

> In *Perez-Ponce*, the Eighth Circuit analyzed facts similar to this case:
>
> the [defendant] was clearly eligible for deportation. He had been deported for a prior felony conviction; the existence of the felony is undisputed. In fact, [the defendant] freely admitted his state drug trafficking conviction at his deportation hearing. As a previously convicted drug trafficker, the [defendant] was presumed to be deportable. 8 U.S.C. § 1101(a)(43) and 1251(a)(2)(A)(iii). In short, whatever the procedural defects at his deportation hearing, the [defendant] "would have no chance of winning an appeal."

62 F.3d at 1122, citing *United States v. Espinoza-Fario,* 34 F.3d 469, 471-72 (7th Cir. 1994). *See also Mendez-Morales*, 384 F.3d at 931-32; *United States v. Avila,* 522 Fed.Appx. 369 (8th Cir. 2013) (unpublished) (alien failed to establish § 1326(d)(3) prejudice as it was not reasonably likely the Attorney General would have granted him discretionary relief from deportation in consideration of his two crimes of moral turpitude which make an alien deportable under §1227(a)(2)(A)(ii)); *United States v. DeHorta Garcia,* 519 F.3d 658 (7th Cir. 2008) (Failure to inform alien that he might apply for discretionary relief from removal did not render his removal, based upon his narcotics conviction, fundamentally unfair, as required under § 1326(d)(3); alien had no due process right to be informed of eligibility for, or to be considered for, discretionary relief.)

The Defendant was convicted of Possession of more than thirty five grams of marijuana and Possession with intent to Distribute more than five grams of marijuana, which are both felonies under Missouri law. The Defendant committed the two controlled substance convictions within three months of each other; those convictions alone made him deportable under the INA. He was on probation for the possession of more than 35 grams of marijuana case when he committed the possession with intent to distribute more than five grams of marijuana case. He cannot show that he would not have been deported. Additionally, the Defendant waived the right to appeal that was available to him. The Defendant had the right to challenge the finding that he was deportable and an aggravated felon, however, he elected not to do so. Consequently, the undersigned finds that the prior removal proceedings were not so defective as described in *Perez-Ponce* as to "effectively foreclose his right to a direct judicial review of the deportation."

In sum, the undersigned finds that the Defendant cannot show that the entry of the 2004 deportation order was fundamentally unfair because he cannot show that actual prejudice resulted. He fails to meet the third § 1326(d) factor.

As the Defendant fails to meet the three statutory requirements for making a collateral challenge to the prior removal order, his motion to dismiss should be denied.

## V. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motions to Dismiss (Docs. 21, 22, and 29) be **denied**.

Further, the parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of July, 2016.